Turley, J.
delivered the opinion of the court.
*177 Some time in the month of December, 1838, Geo. F. Napier, one of the defendants, made a written proposal for a policy of insurance to the Tennessee Marine and Fire Insurance Company, which is in the words and figures following, viz:
“I wish a furnace and forge insured, viz: the furnace is situated in Lawrence county, Chief’s creek, stock composed of brick and rock; one bridge house, one bellows house, one coal house, one potting house, one metal house, all of wood, twelve thousand dollars. Amount wished five thousand dollars.
“Forge, situated in Lawrence county, Chief’s creek, two miles below the furnace; one large forge house, 40 feet square, one bellows house, 25 feet square, one tempering cupola, 3 forebays, and three water wheels and fixtures, ten thousand dollars amount — wished five thousand dollars.
Buffalo Iron Works. GEO. F. NAPIER.”
The Company accepted of the terms proposed, and on the 17th day of December, granted a policy of insurance upon the premises, against a loss by fire, to the amount of ten thousand dollars, viz: five thousand on the furnace and its fixtures, and five thousand on the forge and its fixtures. The furnace and all its fixtures, except the coal house, was in a short time after the effectuation of the policy, to wit: on the night of the 21st and 22d of December, 1838, destroyed by fire, and thereupon Napier proceeded to take such steps as seemed to him proper to make his contract of insurance effectual against the company, but the company, under the circumstances of the case, refused the indemnity.
John Catron, claiming to be a creditor of the said George F. Napier, on the 21st day of May, 1841, filed this his bill of complaint, in the Chancery Court at Franklin, against Geo. F. Napier and Tennessee Marine and Fire Insurance Company, alleging the fact of such indebtedness to him on the part of said Napier; that he had removed himself out of the jurisdiction of the State, and, the fact that the Tennessee Marine and Fire Insurance Company was indebted to him by virtue of the policy of insurance, in the sum of five thousand dollars, and prays that it be attached in its hands, and appropriated by a decree of the court to the payment of his debt..
*178 A decree of this character is resisted by the Company upon several grounds:
1st. It is contended, that there is no proof in the record showing that John Catron, the complainant, is a creditor of defendant, George F. Napier.
We have no doubt that in point of fact, out of the record, the indebtedness does exist; but it would be difficult to establish its existence by any proof in the record; most certainly the amount of such indebtedness cannot be so established; but we do not think that an investigation and determination of this question, is at all material for the determination of this case, as we are well satisfied, that upon other points made, it must be decided against the complainant, and in favor of the Insurance Company; and therefore have not deemed it necessary to enquire minutely whether there is any sufficient proof of the indebtedness charged in the bill.
2d. It is contended, that George F. Napier, at the time the policy of insurance was effected, was the owner of only one-half of the premises insured; which fact he did not disclose to the Company at the time, and that this neglect, whether fraudulent or innocent, vitiates the policy.
The facts material for the consideration of this point are: Geo. F. Napier and Felix Catron bought, as joint tenants, the premises insured from John Catron, the complainant, who conveyed to them by deed in fee simple, under which they entered in possession, they having continued for a considerable time in the use and occupation of the Iron Works.— Felix Catron proposed in writing to sell his interest therein, upon specified terms, to Geo. F. Napier, to which he replied, that he would take his interest upon the terms proposed, supposing the debts of the establishment, which by the terms he was to pay, did not amount to more than twelve thousand dollars.
Nothing further appears to have been done by the parties to effectuate this arrangement; no conveyances were ever made; Napier never complied with any of the terms of the proposition on his part; it does not appear whether the debts due were more or less than twelve thousand dollars. Felix Catron continued to reside at the works up to the time of the *179 destruction of the furnace by fire; and appears to have been greatly agitated and distressed at the happening of that event, and much more so, indeed, than Geo. F. Napier himself.
All these facts are totally inconsistent with the idea, that a sale had been made by Felix Catron of his moiety of the premises.
We are constrained to say, that the proposition to sell, which was made and accepted upon the terms stated, was never carried into execution, for some reason, which does not appear of record, but most probably, eitheir because Napier could not, or would not comply with the terms thereof, or because the debts, upon being ascertained, amounted to more than twelve thousand dollars. This being so, George F. Napier was the owner only of one undivided moiety of the premises insured. This fact was not communicated to the Insurance Company, and he effected as we have seen, an insurance upon the whole estate in his own name, and for his own benefit. Now, does this vitiate the insurance? We think it does. If the Insurance company had been informed by Napier, that he was only the owner of one-half, they surely would not have permitted him to effect an insurance on more than that half, they might not have insured at all. For Napier being the owner of only one-half of the property insured, he had in the first place only one-half as much interest in protecting it from destruction by fire, as he would have had otherwise. '
In the second place, being the owner of only one-half, and having insured for the whole in his own name, and for his own benefit, he had much higher temptation to apply the brand with his own hand.
And in the third place, had the Corporation known that Felix Catron was the owner of the one half, they might not have chosen to risk upon his care and diligence, in securing the property from loss.
In the case of Williams vs. Smith, 2d Caines’ Rep. 13; Livingston, J., delivering the opinion of the court, says: “It is essential to the validity of every contract of this kind, viz: Insurance, that an account be given to the underwriters, of every'material fact, which enhances the risk. This ac *180 count, in other words, should be exact and complete, because the insurer computes his risk by it. If, therefore, any circumstances be suppressed or concealed, which the insured knows to exist, and which if declared, would entitle the other party to demand a higher premium, the contract is void; for every intentional concealment of circumstances which vary the risk, is regarded as a fraud.
“But it is not only a fraudulent concealment, or misrepresentation, that will vitiate a policy. If a misrepresentation be made from oversight, or with the utmost good faith, and without any design to impose, still if it be of a material fact, and not true, there is an end of the policy.
“There is no reason why the same rule should not apply to unintentional concealment, nor ought it to form any excuse, that the assured knew nothing of the fact concealed. He is supposed, and ought to know every thing material that relates to the subject of insurance, and is to be presumed to be in a situation to lay before the underwriters every matter necessary to form a just estimate of the risk he is about to assume. The property is his, and by a moderate degree of attention he might obtain every necessary information respecting it. If he does not, he must be deemed guilty of negligence, for which he alone ought to suffer. If neither of the parties knew of a circumstance which subsequent events have discovered to be important, the contract is founded in mutual error, in which case the parties cannot be said to have assented to it. If the assured had known the circumstances he would not have effected an insurance at all, or would have declared it to the underwriters, who would have declined the risk altogether, or have asked an increase of premium.”
This principle the Judge adds, accords with those laid down and illustrated by Mr. Miller, in his Law of Insurance: “Every instance of misrepresentation and concealment, says this learned author, “however unintentional, if it varies the risk undertaken in the minutest particular from that understood, destroys the consent of parties, and annuls the contract.”
It implies not only mistakes, but mistakes founded in fault; culpa lata say the Civilians, “cequo paratur dolo.”
*181 In the case of Smith vs. Williams, 2d Caines’’ Cases 110, Lansing, Chancellor, who delivered the, opinion, says: '“The insurer is a perfect stranger to the subject insured; whatever relates to it, must be considered as particularly resting in the knowledge of the assured and the. law imposes it on him to acquire a competent information respecting it.'
“This is a salutary and well established rule. For how is it possible to determine, with- unerring certainty, the exact state of .intelligence he possessed? or what' portion of the ignorance he possesses, Is to be attributed to his want of exertion, or to his wish of concealment of' latent defects which may affect his interest?” '
“If he does not possess full knowledge of every circumstance respecting it, involving the interest of others, it may be his misfortune, but it must legallyhe imputed to him as a fault.” ■
In the,case of the Columbian Insurance Company vs. Lawrence, 2d Peters’ Rep. 25, Lawrence & Poindexter in the offer made for the insurance, described the property as belonging to them, without any qualifying terms which would lead the mind to suspect that their title was not complete and absolute. The title of the assured was subject to contingencies, and was held under contracts which had become void by the non-performance of the same. Mr. Chief Justice Marshall, who delivered the opinion of the court, in commenting upon this branch of the case, says: “The assured- have not proved such an interest as is described in the original offer for insurance. The contract, for insurance is one in which the underwriters generally act on the representation of the assured, and that representation ought consequentlyto.be fair, and to omit nothing which is material for the underwriters to know. It may not be necessary that the person requiring insurance should state every incumbrance on his property, which it might be required of him to state if it was offered for sale; but fair dealing requires that he should state every thing which might influence, and would probably influence the mind of the underwriter in forming or declining the contract. A building held under á lease for years, about to expire, might be generally spoken of as the building of the *182 tenant; but no underwriter would be willing to insure it as if it was his; and an offer for insurance, stating it to belong to him, would be a gross imposition.”
“Generally speaking, insurances against fire are made in the confidence that the assured will use all the precautions to avoid the calamity insured against which would be suggested by his interest. The extent of this interest must always influence the underwriter in taking or rejecting the risk, and in estimating the premium. So far as it may influence him in these respects, it ought to be communicated to him. Underwriters do not rely so much upon the principle as on the interest of the assured, and it would seem, then, to be always material that they should know how far this interest is engaged in guarding the property from loss.— Marshall, in treating on insurance against fire p. 789, b. 4, ch. 2, says: “It is not necessary however, in order to constitute an insurable interest, that the assured shall in every instance, have the absolute and unqualified property of the effects insured.
“A trustee, a mortgager, a reversioner, a factor or agent, with the custody of goods to be sold upon commission may insure; but with this caution that the nature of the property be distinctly specified.”
“In all the treaties on- insurance, and in all the cases in which the question has arisen, the principle is, that a misrepresentation which is material to the risk avoids the policy.
“In this case the Circuit Court has decided that there is no misrepresentation; that the interest of the assured was truly described in the offer for insurance; and consequently no question as to the materiality of the supposed variance was submitted to the jury. As this court is of opinion that a precarious title depending for its continuance on events which might or might not happen, is not such a title as is described in the offer for insurance, construing the words of that offer as they are to be fairly understood; the circuit court has in this respect misdirected the jury.”
This case came up again for consideration and is again reported in 10th Peter, 507. Mr. Justice Story in delivering the opinion of the court re-affirms the doctrine as it had been *183 previously laid down by Mr. Marshall. He says: “The next question which arises is whether there has been in the proposal for insurance a misrepresentation of the interest of the assured in the property insured, and if there has been, whether if that representation is material to the risk and would have enhanced the premium, it avoided the policy.
“The proposal for insurance describes the property and interest thus: “What premium will you take to insure the following property belonging to Lawrence and Poindexter for one year, against loss or damage by fire, on their stonemill, four stories high, covered with wood, situate, &c.” It was decided by the court, in the former case reported in 2d Peter, Rep. 47, that the real interest existing in Lawrence & Poindexter, at the time of the proposal was not such as is described therein. It was further decided by the court in the same case, that a misrepresentation of the interest of the assured which is material to the risk, would avoid the policy.
“Wethink the reasoning of that case upon this point entirely satisfactory, and founded in the true exposition of the contract of insurance. Whenever the nature of this interest would have or might have a real influence upon the underwriter, either not to underwrite at all, or not to underwrite except at a higher premium, it must be deemed material to the risk, and if so, the misrepresentation or concealment will avoid a policy.”
These authorities are decisive of the question, and establish, beyond a doubt, that if the insured at the time of his insurance, represents his interest in the property to be greater than it is, the policy is void, and this whether the misrepresentation be the result of ignorance or design.
The case of Strong vs. Manufacturing Insurance Company, 10th Pickering, if it were at variance with these cases, could not influence our judgments against them; but upon scrutiny it will be found not to be so much at variance, if at all, as at first might be supposed. The same general principles of law are certainly laid down in it, and if there be a variance, it is only in the application of those principles to the case then under consideration.
Wild, J., who delivered the opinion says: “But the princi *184 pal objection on which the defendant’s counsel rely is, that the plaintiff did not make a full and fair representation of his interest, and that there was such concealment as vitiated the policy.
“Undoubtedly the plaintiff was bound to make a full and fair exposition of all the facts and circumstances relating to the condition, situation and value of the property insured, and to disclose his interest therein as far as was material to the risk. But we do not perceive how the incumbrances on the plaintiff’s property could be considered as material to the risk, the destruction of the house did' not extinguish the mortgage debts, so that he was interested in the full amount of the value of the property insured. It was not necessary to specify in the policy that the property was under mortgage.”
Now it is obvious, that the court, in this case after establishing the same general principles, as the cases we have referred to only excluded the case then under consideration from their operation, because it held, that the interest of the assured was coextensive with the estate insured, and that he had as great inducements to protect it from loss as if it had not been mortgaged, the burning of the house still leaving the mortgage debt unpaid.
Now, in all the other cases it was held that the interest' of the assured was not coextensive with the estate insured, and that there was not as high inducements to protect the property from loss.
Such is this case; the Iron Works insured are represented by George F. Napier as belonging to him, when he was only the owner of one half thereof, his interest was not coextensive with the estate,, and in consequence of this misrepresentation, the Insurance Company have been misled as to the amount of care which his interest would recommend him to take in the preservation of the property. Upon principle and authority then the policy of insurance is void and cannot be enforced against the Corporation.
Here we might rest this case; but there are two grounds of defence relied upon by the Corporation, which we deem it proper to notice: these are that the policy is also avoided *185 by reason of overvaluation, of the furnace with its fixtures, which as we have seen was estimated at twelve thousand dollars by the assured, and that the policy was obtained in fraud by Napier, with a view to its destruction, in order to charge the Insurance Office. We have no doubt from the proof that the property was grossly overvalued, having been estimated at some four thousand dollars more than it was really worth. This of itself would avoid the policy, for though it is true, that slight over-estimates, such as a man might in the valuation of his property honestly make, would not vitiate a policy of insurance, yet it is equally true, that an over-estimate such as shocks the sense, and shows that it could not have been made but by design, will. This, an overestimate of one third, surely is. As to the fraudulent intent of the assured, in procuring the policy with a design of destroying the property himself, without undertaking to assert the fact to be so, we are constrained to say, that there is too much reason for believing that he did, and that he carried the nefarious design into execution.
What are the facts from which our inference is made not improbable? During the whole period of time in which the furnace was in blast, it was not insured; the reason assigned for this is, a lame and impotent one, that is, that the assured could not get the money to pay the premium. It must be obvious that there was more necessity for insuring at that time, than after, when it. was not in operation; and it is difficult to conceive that the owner of Iron Works, such as these are described to have been, could not at any time raise an amount sufficient to pay the premium of insurance upon ten thousand dollars.
The furnace had been out of operation six months before the time of insurance. George F. Napier had become insolvent, and was making arrangements to remove himself and property south; he had sent off a portion of his property in that direction, and as we unhesitatingly believe was preparing to follow it in a very short time, as he actually did. He could then have no intention of working the furnace again, but his design obviously was to abandon it, having never paid any consideration for it, and never intending to do it. Why *186 then insure? But the most startling fact perhaps in connection with this subject is, that the furnace should have stood six months after it went out of blast, uninhabited, and that George P. Napier’s personal enemies were vindictive enough to destroy his property by fire, should have been so kind and considerate as to postpone the execution of their design, till he could go to Nashville, effect an insurance thereon, and immediately thereafter, directly upon his return should perpetrate the act. The insurance was made in Nashville on the 17th December, 1838, and the furnace was burnt in Lawrence county, on the 28th day of the same month. In addition to all this, his behaviour on the occasion as described by the witness was that of chuckling congratulation; while his partner was very much cast down by the misfortune, he was felicitating himself upon the event; that it was a fortunate thing that he had insured, as he said to some, while to others he pretended that he did not know certainly whether he was insured or not, that he had written to a Mr. Gould at Nashville to have it done.
Yet all these things may be true and the man not guilty of the crime, but such are the suspicions raised by them, that it would be with great difficulty, if at all, that we could have given a decree against the Insurance Company, if this had been the only objection against it.
We therefore, upon the whole view of the case, affirm the decree of the Chancellor dismissing the bill.